## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ASHLEY WRIGHT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHERN NEW HAMPSHIRE UNIVERSITY.<br><br>Defendant. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ashley Wright brings this Class Action Complaint ("Complaint") on behalf of herself, and all others similarly situated (the "Class Members") against Southern New Hampshire University ("SNHU"), which operates, controls, and manages at least the domains "https://www.snhu.edu" and "https://my.snhu.edu/" (collectively, the "SNHU Properties"). The allegations contained in this Complaint, which are based on Plaintiff's knowledge of facts pertaining to themselves and their own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of similarly situated individuals to address SNHU's disclosure of its students' and prospective students' private data, including personally identifiable information ("PII") and educational records, to unauthorized third parties, including at least Meta Platforms, Inc. ("Facebook" or "Meta"), Google LLC ("Google"), Snap Inc. ("SnapChat"), and TikTok Ltd. ("TikTok").

2.      This occurred and continues to occur because of the tracking technologies installed on the SNHU Properties available to students and/or prospective students, including but not limited

to the Facebook Pixel, Google Analytics, Google Tag Manager, Google Ads, the TikTok Pixel, and Snap Pixel (collectively, "Tracking Technologies").[1]

3.     The Tracking Technologies SNHU installed and configured on the SNHU Properties allow unauthorized third parties to intercept the contents of users' communications, receive and view users' private information, and use it for their own purposes, including in connection with lucrative ad services.

4.     SNHU owns and controls the SNHU Properties which it encouraged Plaintiff and other individuals to use for: (1) applying for admission to SNHU; (2) applying for financial aid; (3) finding on campus and online academic programs; (4) accessing the academic portal "Brightspace"; (5) paying tuition and related bills; (6) completing medical record requirements; and (7) viewing course materials and assignments.

5.     SNHU knowingly and intentionally designed the SNHU Properties to solicit communications of private data from its students and prospective students when they used the SNHU Properties, including when they apply for admission at SNHU and communicate with their educators on the Brightspace portal.

6.     Plaintiff and other Class Members who used the SNHU Properties reasonably believed they were communicating only with SNHU, and nothing about the SNHU Properties' appearance indicated that unauthorized third parties could intercept and/or record, capture, or obtain private information, communications, and PII submitted by students and prospective students.

---

[1] This Complaint demonstrates various Tracking Technologies were still used on the SNHU Properties as of the filing of this Complaint, but given the full extent of SNHU's use of Tracking Technology over time is within its exclusive knowledge and control, Plaintiff cannot allege every tracking and/or marketing tool that was installed on the SNHU Properties during the relevant period. These additional facts will be revealed during discovery.

7.    Unbeknownst to Plaintiff and Class Members, however, the SNHU Properties contained Tracking Technologies within their source code that surreptitiously intercept, record, and transmit Plaintiff and Class Members' private online activity and communications, including within password protected spaces, to third parties without their consent, in violation of numerous laws, industry standards, and user expectations.

8.    For example, SNHU disclosed, and allowed Facebook to intercept and/or record, each prospective student's email address in plain text (i.e., readable to a human), alongside their searches and queries, including the fact that they had applied for admission to SNHU.

9.    The Tracking Technologies SNHU incorporated on the SNHU Properties are not limited to the application process. The same Tracking Technologies are present on all pages of the SNHU Websites, including the pages to obtain financial aid and research specific academic programs. These other pages also impermissibly disclose private information about and SNHU's communications with students, including their financial history and socioeconomic status.

10.    By installing Tracking Technologies on the SNHU Properties, SNHU effectively allowed a bug in Plaintiff and Class Members' web browsers and devices that caused their communications to be intercepted, accessed, viewed, recorded, and captured by third parties in real time, as they were communicated by users, based on SNHU's chosen parameters.

11.    The information SNHU divulged to unauthorized third parties is particularly sensitive, given that it includes education records, which prospective and current students expected to remain private. Worse, this information was not anonymized or deidentified—as reflected by the disclosure of plain text human readable email addresses (e.g., abc@xyz.com)— nor were the third parties prohibited from using this information for their own benefit. Indeed, many of these unauthorized third parties used this information for their own purposes, including to train machine

learning models that power their entire advertising infrastructure.

12.    Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin SNHU from making similar disclosure of its prospective and current students' PII and education records in the future, and to fully articulate, *inter alia*, the specific information it discloses to third parties and to identify the recipients of that information.

13.    As a result of SNHU's conduct, Plaintiff and Class Members have suffered numerous injuries, including invasion of privacy, loss of benefit of the bargain, diminution of value of the private and education information, statutory damages, and the continued and ongoing risk to their private information.

14.    Plaintiff seeks to remedy these harms and brings causes of action for (1) violations of the Electronic Communications Privacy Act ("ECPA"); (2) violation of Cal. Penal Code §§ 631, 638.50 ("CIPA"); (3) intrusion upon seclusion; (4) violations of the California Constitution; (5) violations of Cal. Bus. & Prof. Code §§ 17200 ("UCL"); (6) violations of Cal. Penal Code § 502 ("CDAFA"); (7) negligence; (8) unjust enrichment.

## THE PARTIES

15.    Plaintiff Ashley Wright resides in Contra Costa County in the State of California.

16.    Defendant SNHU is headquartered at 2500 North River Road, Manchester, New Hampshire 03106 and operates the SNHU Properties, which SNHU makes available so prospective and current students can communicate with SNHU, including completing applications, submitting necessary documents, participating in classes, and more.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class

Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different State than SNHU.

18.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

19.     This Court has personal jurisdiction over SNHU because SNHU has sufficient minimum contacts within this District. SNHU is headquartered at 2500 North River Road, Manchester, New Hampshire 03106, which is in this District, and it provided education services to students in this District.

20.     Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     The SNHU Websites

21.     Founded in 1932, SNHU is a private, nonprofit educational institution that offers both in-person and online college courses. It currently offers over 200 online programs, including degrees in accounting & finance, computer science, business, and criminal justice.

22.     SNHU operates and manages multiple web properties, including "https://www.snhu.edu" and "https://my.snhu.edu/" (collectively, the "SNHU Properties") to, among other things, allow prospective students to learn more about the types of degrees SNHU offers, financial aid, and apply online for admission.

23.     To apply for admission at SNHU, prospective students must provide information about the type of degree they are interested in, including degree level, area of study, program, and whether they are applying for online or on-campus courses. They must also provide multiple types

5

of PII, including their name, phone number, email address, physical address, gender, as well as their educational background, such as whether they have a high school diploma or college degree, and if so, where it is from.

24.     After completing the application, SNHU prompts the prospective student to create a password for their account, where they will receive news about their application status.

25.     All students who are admitted to SNHU and enroll in a degree program have access to https://my.snhu.edu/, the mySNHU student web portal, which includes Brightspace where students can view their courses, assignments, and grades. SNHU refers to this as the "virtual gateway to all things SNHU."[2] The portal is password-protected and can only be accessed by students who enter their valid SNHU email, their password, and (at least for Plaintiff Wright) complete two-factor authentication. Plaintiff Wright and Class Members reasonably expected the information on this password-protected portal to remain private.

26.     From this web portal, students can access their class schedule, assignments, grades, GPA, SNHU email account, financial aid package, billing details, and submit their medical record requirements.

27.     Unbeknownst to prospective, current, and past students, SNHU secretly embedded a host of tracking technology on the SNHU Properties, allowing the interception of their private PII and sensitive education records.

**II.     The Tracking Technologies at Issue**

28.     SNHU incorporated Tracking Technologies from various third parties, typically in the form of snippets of code embedded in SNHU Properties that surreptitiously intercept a users'

---

[2] *Accepted Students*, SNHU, https://campus.snhu.edu/admission/accepted-students (last visited January 19, 2026).

actions, including private communications on that app or property. These third parties include at least, Meta, Google, TikTok, and Snapchat, many of whom are some of the largest advertising platforms in the world and who use the intercepted information for their own commercial purposes, including to augment the profiles they maintain about individuals, and improve their technology for targeting individuals with ads both on properties they own and operate (e.g., Facebook, Instagram, Google.com, the TikTok or Snapchat apps) and other web properties that participate in their respective ad networks.

### A. Meta's Business Tools and the Pixel

29.     Meta operates the world's largest social media company and generated $164 billion in revenue in 2024, almost all of which comes from advertising. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level.

30.     In conjunction with its advertising business, Meta encourages and promotes entities and web property owners, such as SNHU, to utilize its "Business Tools" to gather information about people, identify, target, and market products and services to them.

31.     One of such Business Tools is Meta Pixel.  Upon its release in 2015, Meta touted Meta Pixel as a new way to gain insights about how people use your website. The "pixel" itself is a small snippet of website code written by Meta engineers. To use the Meta Pixel, an advertiser places a pixel (i.e., a code snippet) on their website.

32.     The Meta Pixel is designed to "track[] the people and type of actions they take" across all pages accessible on a web property (e.g., such as all pages accessible under SNHU.com) with a single code snippet.[3] When a user accesses a webpage on a web property using the Pixel,

---

[3] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting (last visited January 14, 2026).

their communications with *every* webpage are instantaneously and surreptitiously intercepted and recorded by Meta's code and sent to Meta's servers.

33.     Through this technology, Meta intercepts information about each page a user visits, what buttons they click, as well as specific words they type into form boxes (e.g., when applying for admission, signing up for a class, or searching) on the web property. Meta also receives "events" data reflecting data fields identified by the web property owner, which can reveal even more information about the individual and their specific interactions or communications.

34.     The information Meta receives via the Meta Pixel includes identifying information that is sufficient to identify a particular individual either directly (e.g., by name or email) or in combination with other information, like unique devices identifiers, cookie values, IP addresses, already in Meta's possession (e.g., either because it was collected from a another web property using its Tracking Technology or the individuals' use of a Meta owned and operated app or property). For instance, Meta uses "[a]dvanced matching" techniques to link the data received via the Meta Pixel to Facebook users[4]  and also analyzes information entered in online forms to uncover further PII about the user, such as their email address, to further identify each respective individual.[5]

35.     Meta stores the data captured by its Tracking Technologies on its own servers for its own commercial purposes. Meta then provides the web property owner whose property this information is recorded from with access to analytics generated from the data recorded (e.g., which users took certain actions on any given webpage, how many, etc.). This is accessed through the

---

[4] *Advanced Matching*, META https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ (last visited January 26, 2026).
[5] *About advanced matching for web*, META https://www.facebook.com/business/help/611774685654668?id=1205376682832142 (last visited January 26, 2026).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

web property owner's Facebook Ads Manager account, as well as potentially through the Facebook Events Manager.[6] The data available to the web property owner is a limited set and *does not* include all information Meta has about the individuals whose communications and actions it recorded through its Tracking Technology.

36.    In this way the Meta Pixel has 2 purposes: (1) it enriches Meta's ability to collect data about individuals across the web, and enriches its profiles about them, and (2) facilitates web property owners spending money on Meta ads. For instance, Meta encourages website owners to create "custom audiences" of users who have taken the same or similar actions on the website based on the data received through the Meta Pixel to target them directly with ads. Meta also uses this audience to "identify other Facebook users" similar to them (i.e., "lookalikes") and to "target [those similar users] with [the website owner's] ads."[7] Meta uses the full complement of data in its possession—not just that received from the web property—to identify these individual targets.

37.    Meta also uses the data it receives through the Meta Pixel to fuel its own advertising business. Meta's documentation confirms that Meta feeds the data received through the Meta Pixel into "machine learning models" that "consider that person's behavior" to predict who is likely to respond to any given ad, making its advertising services even more lucrative.[8] These machine learning models "learn[]" more about individuals as they "receive[] new data."[9] Thus, each person whose data Meta receives through the Meta Pixel directly contributes to how successful Meta is at targeted advertising and contributes to Meta's ad revenue.

---

[6] *Conversion Tracking*, META https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited January 26, 2026).
[7] *Id.*
[8] *Good Questions, Real Answers: How Does Facebook Use Machine Learning to Deliver*, META (June 11, 2020), https://www.facebook.com/business/news/good-questions-real-answers-how-does-facebook-use-machine-learning-to-deliver-ads.
[9] *Id.*

38.     In true move fast and break things spirit, Meta built these systems to sell ads without incorporating any way to limit or prohibit the use of data collected through Meta Pixel. According to leaked internal Meta documents, Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'" Thus, any data the Meta Pixel intercepted from SNHU's Properties was incorporated into Meta's ads systems and models, and benefited its business.

39.     Meta's customers, like SNHU, can also send data to Meta through a server-to-server connection or through a third-party intermediary (e.g., sending data to a data platform like AppsFlyer or mParticle which then routs traffic to Meta and others). This allows customers like SNHU to disguise what data it sends to Meta because no one (other than these parties) can observe what data SNHU uploads directly to Meta for use in ads, or sends through third parties. Which data SNHU uploaded to Meta directly or sent through third parties and how that data is used, accordingly, will be uncovered during discovery.

### B.  Google Ads and Google Analytics

40.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $3 trillion dollars. The core driver of this value is digital advertising.

41.     Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[10]

42.     Google offers various tracking technologies, including Google Analytics and

---

[10] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

43.    Google Analytics is deployed much like the Meta Pixel by dropping a piece of Google-engineered code on a given web property or app. This code immediately intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and input into text fields.

44.    The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. This does not require a person to have a Google account, to be signed into their Google account, or using a Google product. Google has a special set of cookies and systems created specifically to track and identity individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.[11]

45.    Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the

---

[11] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned and operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

46.    In addition to providing customers with ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users.

47.    Similar to Meta, customers like SNHU can also send data to Google through a server-to-server connection or through a third-party intermediary. This allows customers like SNHU to further disguise what data it sends to Google because no one (other than these parties) can observe what data is sent server-side.

## C. TikTok

48.    TikTok has more than 1 billion monthly users worldwide and is one of the top five largest social media companies. TikTok's main source of revenue is selling ads.

49.    To increase its advertising revenue, TikTok offers tracking and analytics services, including through the TikTok Pixel. More than a million websites, including SNHU, incorporate the TikTok Pixel.

50.    The TikTok Pixel (like the other tracking technologies described above) is a piece

TikTok engineered code that web property owners place on a website. Once installed, the pixel tracks users' interactions, including what pages they view, buttons they click on, and information they enter, along with a unique identifier. The TikTok Pixel intercepts these communications immediately after they are sent and before they are received by the website operator.

51.    In addition, the TikTok Pixel collects information that directly or in combination with information already in its possession identifies an individual. This includes the users' IP address, digital fingerprint data (e.g., the device make, model, and operating system, browser information), a unique session ID, and cookie values that can be associated with a specific user. For instance, TikTok states that it uses the cookie values it collects and/or its "Advanced Matching" feature to "recognize and learn about *people* from [the] website and the types of actions *they* do or don't take." (emphasis added)

52.    In April 2022, TikTok started automatically collecting first- and third-party cookies[12] across all websites that incorporated the TikTok Pixel prior to March 10, 2022.  By capturing identifies used by web property operators as well as other third parties, TikTok broadens its ability to track individuals across web properties and apps and to identify them by joining data against these various identifiers. This enhances TikTok's ability to target users on its platform with ads, matching that data against information associated with their TikTok account.

53.    Similar to Meta and Google, customers like SNHU can also send data to TikTok through a server-to-server connection or through a third-party intermediary. This allows customers like SNHU to further disguise what data it sends to TikTok because no one (other than these parties) can observe what data is sent server-side. Information about which data SNHU uploaded

_____

[12] First-party cookies are supposed to be cookies set by the website domain owner, whereas third-party cookies are cookies set by anyone other than the website domain owner.

to TikTok directly or through third parties is exclusively within SNHU's possession and control and thus will be identified during discovery.

### D. Snapchat

54.     Snapchat is a publicly traded company with over 900 million daily active users across the globe. As Snapchat admits in its filings with the SEC, "substantially all of [its] revenue" is generated from advertising, with 91% of its revenue in 2024 coming from ads.

55.     As Snapchat also admits, its advertising business "rel[ies] heavily" on its "ability to collect, process, and disclose data" including "personal data" to advertisers and others.[13]

56.     Like the other advertising giants above, Snapchat offers tracking tools, including the Snap Pixel, to collect information that feeds its advertising business.

57.     The Snap Pixel (like other pixels) is a snippet of code placed on an advertiser's web property that tracks user actions as they interact with a website, including their actions and queries, such as viewing a particular webpage, making a purchase, and adding a specific item to their cart.

58.     Snapchat "strongly" encourages its customers (i.e., web property owners) to send individual email addresses or phone numbers through the Snap Pixel so they can better target these individuals with ads., e.g., by joining the data intercepted with their Snapchat profile or other data in Snap's possession. In addition to these forms of PII, the Snap pixel also intercepts IP address, first and third-party cookies, and other browser information that helps to fingerprint users.[14] Snap uses this "variety of signals" to engage in "PII matching" and identify individuals.[15]

59.     Snapchat uses this identifiable data, not only to serve ads on behalf of its customers,

---

[13] SNAP INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2024, https://www.sec.gov/Archives/edgar/data/1564408/000156440825000019/snap-20241231.htm?
[14] *Pixel Implementation FAQs*, SNAP, INC., https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited January 26, 2026).
[15] *Id.*

but for its own reasons. This includes training machine learning models, improving targeting capabilities, creating custom and "look-alike" audiences and models, and for reporting purposes.[16]

60.    In addition to the Snap Pixel, Snapchat also has a Conversions API, which allows customers, like SNHU, to send data directly to Snapchat through a server-to-server integration. Snapchat encourages customers to use these technologies together, which avoid detection because no one other than Snapchat and its customer can observe what data is sent through this connection.[17][18] As with other upload only and third party data flows described above, which data SNHU uploaded directly to Snap is exclusively in its possession and will be identified in discovery.

## III.    SNHU's Use of These Tracking Technologies

61.    SNHU incorporated Tracking Technologies on the SNHU Properties, including at least Google, Meta, TikTok, and Snapchat. Through these Tracking Technologies, SNHU disclosed Plaintiff and Class members' private communications to these third parties, as well as identifiable information, including their email addresses, unique user and device identifiers, digital fingerprint, and IP Addresses.

### A.    SNHU Application Process

62.    Prospective students apply to SNHU through the SNHU Properties. Every prospective student who started this application process had their identifiable PII, including email addresses, and private data disclosed to and intercepted by third parties through at least the Tracking Technologies described above.

63.    For example, as depicted in Figures 1-3, because the Meta Pixel was incorporated

---

[16] *Id.*

[17] *Snap Pixel: Power Your Ad Performance*, SNAP, INC., https://forbusiness.snapchat.com/advertising/snap-pixel? (last visited January 26, 2026).

[18] This does not capture the full extent of the third parties whose Tracking Technologies SNHU installed on the SNHU Websites, which can only be revealed in discovery.

in the background of the student application process, SNHU disclosed and allowed Meta to record that the prospective student started an application for admission at SNHU. This information was recorded as a "PageView" event containing at least the full-string URLs[19] revealing the page the prospective student is currently on (via the "dl" field), the prior page they had visited (via the "rl") field, as well as the title of the page, a description, and keywords.

**FIGURE 1**

| dl | https://www.snhu.edu/admission/apply-now |
|----|------------------------------------------|
| rl | https://www.snhu.edu/ |

| pmd[title] | Apply Now | Online Application | SNHU |
|------------|----------------------------------------|
| pmd[description] | Take the first step toward the professional future you deserve by taking advantage of SNHU's quick-and-easy online application process. |
| pmd[keywords] | Apply Now |

64.     Once the prospective student completes the application, Meta intercepts additional information about the user, including full-string URLs revealing that the application is now completed through the "SubscribedButtonClick" event.

**FIGURE 2**

| ev | SubscribedButtonClick |
|----|------------------------|
| dl | https://www.snhu.edu/admission/apply-now/application/thank-you |
| rl | https://www.snhu.edu/admission/apply-now/application |

65.     But that is not all. Meta also receives in the same transmission the prospective students' email address in plain text visible below. As a permanent form of PII, Meta can use this email address to identify the prospective student on its own platform, e.g., by matching the email address to the email address used in an individual's Facebook or Instagram account, as well as an

---

[19] Full-string URLs, as opposed to partial strings, reveal the specific page the individual is viewing or the action they are taking.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

anchor for associating data received from other web properties using the Meta Pixel with the same individual.

**FIGURE 3**

cd[buttonFeatures]    {"classList":"btn btn-lg btn-block btn-cta","destination":"https://admission.snhu.edu/s/portallogin?email=████████@gmail.com&code=████████

66.    SNHU disclosed similar data to Google. When a prospective student starts an application at SNHU, SNHU also allowed Google to intercept first-party cookie values, including the "cid" and "sid" cookie, which are unique values that identify a Google user's account. These cookies were sent alongside full-string URLs revealing that the prospective student was completing the application through the "page_view" event.

**FIGURE 4**

| | |
|---|---|
| dl | https://admission.snhu.edu/s/action-item-overview |
| dr | https://admission.snhu.edu/s/applicationform?firstTimeLogin=true |
| dt | Southern New Hampshire University Admission Application |
| en | page_view |

67.    Google continued to secretly spy on the prospective student as they continued to navigate through the application, noting what "opportunity_stage" the individual was at, including (in this example) that the "App [was] in Progress" for an "ONL – Online Undergrad" degree. Google also intercepted data reflecting when the prospective student had completed the application.

**FIGURE 5**

| | |
|---|---|
| url | https://www.snhu.edu/admission/apply-now/application/thank-you |
| ref | https://www.snhu.edu/admission/apply-now/application |
| tiba | Thank You | SNHU |

68.    But again, that is not all. Google also intercepted information reflecting the specific

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

degree, area of study, and program the prospective student sought to apply for. In this example (reflected in Figure 6), an Associate Degree in Accounting and Finance. Google also received the prospective students' email address, again in plain text, via the "dl" field as shown in Figure 7, below.

**FIGURE 6**

| ep.degree_level | Associate |
| ep.area_of_study | Accounting and Finance |
| ep.program_name | AS Accounting |
| ep.program_code | AS.ACC |

**FIGURE 7**



dl    https://admission.snhu.edu/s/portallogin?email=▮▮▮▮▮gmail.com&code=▮▮▮▮▮

69.     Snapchat obtains similar data. Figures 8-9, below, shows that Snapchat obtains browser and device level information, as well as unique identifiers it uses to track and identify individuals, including the u_sclid parameter, which are unique identifiers set by Snapchat.

**FIGURE 8**

```
u_sclid: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"
u_scsid: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"
```

70.     Snapchat also obtains full-string URLs indicating that the prospective student has completed the application, as well as SNHU's communications back to the prospective student.

**FIGURE 9**

```
1: {tagProtocol: 3, tagData: {og:url: "https://www.snhu.edu/admission/apply-now/application/thank-you"}}
  tagData: {og:url: "https://www.snhu.edu/admission/apply-now/application/thank-you"}
    og:url: "https://www.snhu.edu/admission/apply-now/application/thank-you"
    tagProtocol: 3
2: {tagProtocol: 3, tagData: {og:title: "You're on your way, ##FirstName##!"}}
  tagData: {og:title: "You're on your way, ##FirstName##!"}
    og:title: "You're on your way, ##FirstName##!"
```

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

71.    Finally, TikTok obtained substantially the same information.

72.    For example, TikTok also received full-string URLs reflecting when the prospective student completed the application, alongside their email address displayed in plain text in the "attribute" field.

**FIGURE 10**

```
▼ page: {url: "https://www.snhu.edu/admission/apply-now/application/thank-you",…}
   load_progress: "2"
   referrer: "https://www.snhu.edu/admission/apply-now/application"
   url: "https://www.snhu.edu/admission/apply-now/application/thank-you"
```

**FIGURE 11**

```
▼ attributes: {class: "btn btn-lg btn-block btn-cta",…}
   class: "btn btn-lg btn-block btn-cta"
   destination: "https://admission.snhu.edu/s/portallogin?email=███████@gmail.com&
   id: "appPortalLink"
```

73.    TikTok also receives browser and device information, as well as the session_id, and csid.

74.    None of these third party advertising companies would have access to Plaintiff and Class Members' email addresses and private education data absent SNHU incorporating this technology on the SNHU Properties. And this is likely only part of the private data they received. As explained above, SNHU likely discloses even more information to these entities through server-to-server integrations by uploading lists containing individual PII to enhance ad targeting, information which can only be revealed through discovery.

**B.  mySNHU Website**

75.    SNHU also provides each student with access to the mySNHU student portal— including the Brightspace portal— to review their course schedule, assignments, grades, financial aid information, pay bills, complete medical record requirements, and more.

76.    SNHU incorporated Tracking Technologies on these password-protected portals.

As a result, SNHU disclosed students' communications on these web properties to third parties, including Meta, Google, TikTok, and Snapchat.

77.    For instance, SNHU allows Google to begin intercepting Plaintiff and Class Members' private data from the moment they log on to the mySNHU student portal. Google receives the students' IP address, browser information, and the unique "cid" cookie that Google uses to uniquely identify each student in its own systems, as well as full-string URLs reflecting that the student has logged into the SNHU student portal via the "dl" and "dr" field.

**FIGURE 12**



78.    Google also intercepts even more details about the student once they log-in to the SNHU portal, including the student's academic level, the "business unit" (reflecting type of program) and "market segment" (reflecting online or in-person, undergrad or graduate), whether the program is online, if they are a "first generation learner", their GPA, race, whether they are military affiliated, and employment status, as shown in Figure 13.

**FIGURE 13**



79.    And while Google can already identify each student, having previously intercepted their plain text email address, as well as device and user identifiers, Google also intercepts the communication SNHU sends to Plaintiff and Class Members upon log-in, which includes their first name.

80.    Google continues to intercept data as the student navigates through the student portal, tracking each and every one of their searches and queries. This includes when a user requests a transcript or views an article from within the portal, alongside the same device and user identifiers described above. An example of this is reflected in Figure 14.

**FIGURE 14**

dl                         https://unify-snhu.my.site.com/mysnhu/s/article/sn

dr                         https://unify-snhu.my.site.com/mysnhu/s/snhu-ne
                            ws

81.    The same happens when Plaintiff and Class Members logged into the Brightspace student portal to view their courses, assignments, and grades. For example, as soon as a student clicks onto a course, Google intercepts the course code, course title, and course term via the "dt" field.

**FIGURE 15**



82.     Google also intercepts and tracks specific actions taken from within courses, such as whether a student is viewing recent announcements, their current grade, the class list, assignments, their submission history, and their course calendar. This information is also intercepted via the "dt" field.

**IV.     Plaintiff Wright's Private Data Was Unlawfully Intercepted**

83.     Plaintiff Ashley Wright has been a student of SNHU since May 2025. As an SNHU student, Plaintiff Ashley Wright paid money to SNHU in exchange for college credits. Plaintiff Ashley Wright also has accounts with TikTok, Google, Facebook, and Snapchat.

84.     In approximately January 2025, Plaintiff Ashley Wright used the website available at https://www.snhu.edu/ to search for specific college degrees, explore financial aid options, and apply to SNHU.  In the process of doing so, Plaintiff Ashley Wright completed the SNHU online admission application and created an account with SNHU. This required Plaintiff Ashley Wright to enter her PII, including her email address, on SNHU's Properties.

85.     Plaintiff Ashley Wright is currently enrolled at SNHU and frequently visits the website available at https://my.snhu.edu/, including the SNHU Brightspace portal, using her SNHU email and password. This includes frequently viewing her courses, assignments, and grades.

86.     Unbeknownst to Plaintiff Ashley Wright, while she was communicating with

SNHU on the SNHU Properties, SNHU disclosed her private and identifiable communications to third parties, including, at least, Google, Meta, Snapchat, and TikTok. This included Plaintiff Ashey Wright's private searches and queries on the SNHU Web Properties, including completing the SNHU admission process, her GPA, the courses she was enrolled in, her employment status and race, and whether she has a military affiliation.

87.     Plaintiff Ashley Wright did not consent to the disclosure and interception of her communications on the SNHU Properties because SNHU never disclosed it would do so.

88.     SNHU, on the other hand, knowingly and intentionally incorporated Tracking Technologies on the SNHU Properties for the purposes of disclosing its users' private communications to third parties, including Meta, Google, Snapchat, and TikTok, so that it could use the advertising services offered by these third parties to serve targeted advertisements both to them (e.g., to encourage them to take more classes) and others like them (e.g., known as "lookalikes" who are prospective students) and, consequentially, make more money.

89.     As the owner and operator of the SNHU Properties, SNHU had control over the technology it incorporated, and whether it used third parties' Tracking Technologies.

90.     SNHU knew at the time it incorporated the Tracking Technologies on the SNHU Properties that they would result in the disclosure of users' private communications to third parties by virtue of the Tracking Technologies' purpose, how they function, and the analytics and advertising services SNHU received as a result.

91.     For instance, Google provides web property and app operators that use its tracking technology (like SNHU) with access to the data collected from their users and provides them with tools and analytics to leverage that information, including through Google Ads, to reach not only those specific individuals but others like them whom Google identifies based on its vast internal

array of profiling data collected from both Google owned and operated web properties (e.g., Google Maps, YouTube, Google.com) and others that incorporate Google's tracking technology. Meta does the same: providing similar tools (e.g., the Meta Pixel and SDK) and analytics using data collected through those tracking technologies to web property owners that are designed to promote digital advertising on Meta's apps and websites, e.g., by leveraging the data collected in combination with profiles maintained about those individuals to target current students or those who look like them with ads on Facebook, Instagram, and elsewhere. SNHU knew, from these analytics, precisely what type of data it was allowing to be intercepted through these technologies it incorporated on the SNHU Websites.

92.     Despite this, SNHU intentionally continued to disclose its users' private communications through its incorporation of these types of Tracking Technologies on the SNHU Properties, despite the privacy harm it caused Class members.

## V.    Plaintiff and Class Members Do Not Consent to SNHU Disclosure of Their Sensitive Information

93.     Plaintiff and Class members had no way of knowing that SNHU was disclosing and allowing third parties to intercept their private data, including sensitive educational records and their email addresses, when they engaged with the SNHU Properties, including the Brightspace student portal, because the Tracking Technologies were inconspicuously incorporated in code running in the background.

94.     This undisclosed conduct is all the more egregious given the nature of the information entered into the SNHU Websites, e.g., PII and educational records. Plaintiff and Class members would not reasonably expect this information would be disclosed or intercepted without their consent, given its private nature and laws like FERPA designed to protect it.

95.     This is especially true given SNHU's representations that such information would

remain confidential. SNHU maintains a policy specifying students' rights under FERPA, which it calls the "FERPA Student Right to Privacy." This policy states that SNHU will obtain "written consent ***before***" it" discloses personally identifiable information from the student's education records."[20] SNHU's disclosure of private education records with PII to advertising companies through Tracking Technologies as described above violates this express promise.

96.    Based on these representations, SNHU students, including Plaintiff, reasonably believed their private data, including educational records, would not be disclosed or used by third parties.

## VI.    Plaintiff and Class Members have a Reasonable Expectation of Privacy in their User Data

97.    Plaintiff and Class members have a reasonable expectation of privacy in their private communications on the SNHU Properties, including their education records.

98.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

99.    For example, a study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and about the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[21]    Moreover, according to a study by *Pew Research Center*, a majority of Americans,

---

[20] *Academic Catalog*, SNHU, https://www.snhu.edu/admission/academic-catalogs?#/policy/SJLIuL4c- (last visited January 26, 2026).
[21] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-

approximately 79%, are concerned about how data collected about them by companies is used by companies.[22]

100.    Users act consistent with these preferences.  Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data with third parties when prompted.[23]

101.    Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government.  The same study revealed that 75% of people would abandon brands that do not take care of their data.[24]

102.    SNHU's disclosure of Plaintiff and Class members' private communications, including private education records, violates Plaintiff and Class members' privacy interests.

103.    This is especially true in light of the federal laws that exist specifically to protect the disclosure of this type of information, including the Family Educational Rights and Privacy Act ("FERPA").  *See* 20 U.S. Code § 1232g.

---

a3980496907/?srsltid=AfmBOooZKcKElpRb-k9bvaOyAs93buRiD7f-
WN1mFLMcULcWrE2TgAGb.

[22] Brook Auxier, Lee Rainie, et. al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[23] Michael Grothaus, *Apple's newst ad perfectly visualizes how App Tracking Transparency stops companies from stalking you*, FAST COMPANY (May 20, 2021), https://www.fastcompany.com/90638821/apples-newest-ad-perfectly-visualizes-how-its-app-tracking-transparency-privacy-feature-stops-companies-from-stalking-you?.

[24] *New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations*, DATAGRAIL, (Oct. 27, 2022), https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/.

104.    FERPA protects "education records" which are defined as any materials that contain information "directly related to a student" that are maintained by an educational agency or institution.

105.    FERPA mandates that no educational agency or institution shall disclose "personally identifiable information from the student's education record" without a "signed and dated written consent." 34 C.F.R. § 99.30.

106.    The existence of FERPA—designed to protect the records at issue here—further confirm that Plaintiff and Class Members have a reasonable expectation not to have their PII and education data disclosed to third parties.

**VII.    SNHU Users' Private Data Has Value**

107.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling user data. That number has likely increased since then given the ever increasing value of user data in an increasingly digital world.

108.    Consistent with this trend, multiple companies now offer to *pay* consumers to track them online and collect their data.  Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are just a few examples of companies that pay for browsing historical information.

109.    Meta also has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid individuals $20 a month to collect browsing history information and other communications.

110.    The education-based data SNHU disclosed is particularly valuable. Educational institutions spend approximately $200 per lead ("CPL") when advertising to attract prospective

students to attend their institution.[25] Data about these high value leads are also extremely valuable to Meta, Google, TikTok, and Snap as they seek to attract more companies to their services, and broaden their profiles about specific individuals.

111.    For example, Meta has specific advertising functions to target students who attended particular institutions. It also allows targeting based on highest level of education, years in college, and education majors—all information SNHU gives Meta.[26] This too confirms the type of PII and education data SNHU disclosed has objective market value.

112.    Had Plaintiff or Class Members known of SNHU's disclosure of private information to third parties and its misappropriation and misuse of such data, they would not have paid or would have paid less for the SNHU's services, including enrollment.

## TOLLING

113.    The applicable statutes of limitation have been tolled as a result of SNHU's knowing and active concealment and denial of the facts alleged herein.

114.    SNHU secretly incorporated the Tracking Technologies on the SNHU Properties, providing no indication to users that they were interacting with sites that shared their private and information with third parties, including their education records.

115.    SNHU had exclusive knowledge that the SNHU Properties incorporated the Tracking Technologies, yet failed to disclose that fact to users, or that by interacting with the SNHU Properties Plaintiff and Class members' private and education information, would be

---

[25] Patrick Van Gorder, *Higher education lead generation in 2025: Reimagining pay-per-lead strategies*, LEVEL, https://www.level.agency/perspectives/higher-education-lead-generation-ppl-strategies/#:~:text=According%20to%20a%20panel%20discussion%2C%20the%20average,bidding%20strategies**%20%20**Students%20are%20increasingly%20self%2Ddirected** (last visited January 26, 2026).

[26] *Advanced Targeting*, META, https://developers.facebook.com/docs/marketing-api/audiences/reference/advanced-targeting/? (last visited January 26, 2026).

disclosed to and intercepted by third parties.

116.    Plaintiff and Class members could not with due diligence have discovered the full scope of SNHU's conduct, including because it is highly technical (e.g., the Pixels are source code embedded in web properties) and there were no disclosures or other indication that would inform a reasonable SNHU user that SNHU was disclosing their private communications to third parties, including Meta, Google, TikTok, and Snapchat.

117.    The earliest Plaintiff and Class members could have discovered the critical facts of their injury and its cause was during technical analysis conducted shortly before filing of this Complaint.

118.    SNHU had a duty to disclose the nature and significance of their data sharing practices but did not do so. SNHU is therefore estopped from relying on any statute of limitations under the discovery rule.

119.    Additionally, SNHU engaged in fraudulent conduct to prevent Plaintiff and Class Members from discovering the disclosure of their data to third parties.  SNHU misled Plaintiff and Class Members to believe their private information, including education records, would not be disclosed to any third parties through their representations described herein.

120.    Plaintiff and Class Members were not aware that SNHU disclosed their private information, including education records.

121.    Plaintiff and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of SNHU's misconduct by virtue of their fraudulent concealment.

122.    Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## CLASS ACTION ALLEGATIONS

123.    **Class Definition:** Plaintiff brings this action on behalf of themselves and other similarly situated individuals (the "Class"), defined as:

> All natural persons in the United States and its territories who, during the Class Period, used the SNHU Properties, and had their private communications disclosed to and/or intercepted or recorded by third parties via the Tracking Technologies.

124.    Plaintiff also brings this action on behalf of California residents (the "California Class"), defined as:

> All natural persons in California who, during the Class Period, used the SNHU Properties, and had their private communications disclosed to and/or intercepted or recorded by third parties via the Tracking Technologies.

125.    Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

126.    The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

127.    Excluded from the Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

128.    <u>Numerosity/Ascertainability</u>. Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records

and non-party Facebook's records.

129.    Typicality. Plaintiff's claims are typical of the claims of the Classes because Plaintiff used the SNHU Websites and had their personal identifiable information and private data disclosed to third parties such as Facebook and Google without their express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

130.    Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

131.    Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the Classes:

(a)    Whether Defendant intentionally incorporated the Tracking Technologies;

(b)    Whether the SNHU Websites surreptitiously track personally identifiable information and protected communications, and simultaneously discloses that information to third parties;

(c)    Whether the third parties are third-party eavesdroppers;

(d)    Whether Defendant violated Plaintiff and Class Members' privacy rights by using

Tracking Technologies to communicate users' private information to third parties;

(e)    Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, or any other relevant statutes.

132.    <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**<u>FIRST CAUSE OF ACTION</u>**
**Violation Of the Electronic Communications Privacy Act**
**18 U.S.C. § 2510, *et seq***
**(on behalf of the nationwide class)**

133.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class. The ECPA prohibits the intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511. The ECPA protects both the sending and receipt of communications.

134.    The ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

135.    At all relevant times, SNHU aided, employed, agreed with, and conspired with third parties, including at least Facebook, Google, Snapchat and TikTok, to track and intercept Plaintiff

32

and Class Members' internet communications while accessing the SNHU Properties. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiff and Class Members.

136.    The transmissions of data between Plaintiff and Class members and SNHU qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

137.    SNHU intentionally inserted an electronic listening device onto Plaintiff and Class Members' web browsers that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications with SNHU to Meta, Google, Snapchat, and TikTok.

138.    SNHU willingly facilitated third parties' interception and collection of Plaintiff and Class Members' private communications by embedding the Tracking Technologies on the SNHU Websites. SNHU has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

139.    The Tracking Technologies constitute "devices" within the meaning of 18 U.S.C. § 2510(5).

140.    SNHU failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiff and Class Members' communications with SNHU to undisclosed third parties.

141.    The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the communications were intercepted in transit to the intended recipient—SNHU —before reaching SNHU's server.

142.    The third party advertising companies are not parties to Plaintiff and Class Members' communications with SNHU.

143.    As demonstrated herein, SNHU violated ECPA by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the SNHU Websites. Importantly, Meta, Google, Snapchat, and TikTok would not have intercepted or received the contents of these communications (or even had access to them) but for SNHU's actions and incorporations of the Tracking Technologies into the SNHU Properties.

144.    In aiding and permitting third parties to intercept its users' online communications, SNHU had a purpose that was tortious, criminal, and designed to violate state and federal constitutional and statutory provisions including:

(a)    The unauthorized disclosure of private communications to profit from the information is tortious in and of itself. SNHU intentionally committed a tortious act by disclosing to third parties individually identifiable education information without authorization to do so.

(b)    The unauthorized disclosure of individually identifiable information from students' education records violates FERPA. *See* 34 C.F.R. § 99.30. SNHU violated FERPA by intentionally disclosing individually identifiable information from education records without written consent.

(c)    A knowing intrusion upon Plaintiff and Class members' seclusion;

(d)    Violation of CIPA;

(e)    Violation of various state consumer protection statutes, including but not limited to the Unfair Competition Law; and

(f)    Violation of various state computer privacy and property statutes, including but not limited to the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

145.    Plaintiff and Class members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [SNHU] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520. This includes monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by SNHU as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**SECOND CAUSE OF ACTION**
**Violation Of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(on behalf of the California sub-class)**

146.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

147.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

148.    Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any

unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

149.    SNHU is a person for purposes of § 631.

150.    The Tracking Technologies (i.e., Facebook Pixel, Google Analytics, Google Tag Manager, Google Ads, the TikTok Pixel, and Snap Pixel) and Plaintiff and Class member's computers and mobile devices are a "machine, instrument, contrivance, or . . . other manner" under § 631.

151.    Under CIPA, a defendant must show it had the consent of all parties to a communication.

152.    At all relevant times, SNHU aided, employed, agreed with, and conspired with third parties, including at least Facebook, Google, Snapchat and TikTok, to track and intercept Plaintiff and Class Members' internet communications while accessing the SNHU Properties. These communications were transmitted to and intercepted by third parties during the communication and without the knowledge, authorization, or consent of Plaintiff and Class Members.

153.    SNHU intentionally inserted an electronic listening device onto Plaintiff and Class Members' web browsers that, without their knowledge and consent, tracked, intercepted, and transmitted the substance of their confidential communications with SNHU to Meta, Google,

TikTok, and Snapchat—each of whom constitute a "person" within the meaning of the statute.

154.    SNHU willingly facilitated third parties' interception and collection of Plaintiff and Class Members' private education information by embedding the Tracking Technologies on the SNHU Websites. SNHU has full control over the Tracking Technologies, including which webpages contain them, what information is tracked and transmitted, and how events are categorized prior to their transmission.

155.    SNHU failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiff and Class Members' communications with SNHU to undisclosed third parties.

156.    The Tracking Technologies are designed such that they transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the communications were intercepted in transit to the intended recipient—SNHU —before reaching SNHU's server.

157.    As demonstrated hereinabove, SNHU violated CIPA § 631 by aiding and permitting third parties to intercept and receive its users' online communications in real time as they were made via the SNHU Properties. Importantly, Meta, Google, TikTok, Snap, and other unauthorized third parties would not have intercepted or received the contents of these communications but for SNHU's actions and incorporations of the Tracking Technologies into the SNHU Websites.

158.    By disclosing Plaintiff and Class Members' private information, including education records, SNHU violated Plaintiff and Class Members statutorily protected right to privacy.

159.    As a result of the above violations and pursuant to CIPA Section 637.2, SNHU is

liable to Plaintiff and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiff have suffered, or be threatened with, actual damages."

## THIRD CAUSE OF ACTION
### California Invasion of Privacy Act
### Cal. Penal Code §§ 638.50 & 638.51
### (on behalf of the California subclass)

160.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth therein and brings this claim individually and on behalf of the proposed Class.

161.    CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

162.    Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

163.    CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

164.    SNHU is a person under CIPA § 638.51.

165.    SNHU implemented and installed the Tracking Technologies—which are pen registers and/or trap and trace devices—on Plaintiff and Class Members' devices and browsers.

166.    These Tracking Technologies captured "routing, addressing, or signaling information" because they intercept email addresses, unique user and device identifiers, including IP address, and cookies used for purposes of identification.

167.    SNHU was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiff and Class Members' routing, addressing, or signaling information.

168.    Plaintiff and Class Members did not consent to SNHU's installation of a pen register or trap and trace device on their devices and browsers.

169.    Plaintiff and Class Members have been harmed as a result of SNHU's conduct. SNHU did not have authorization to use pen registers and/or trap and trace devices to surveille and identify Plaintiff and Class Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

170.    Plaintiff and Class Members face an imminent threat of continued injury, as this data continues to be stored and used by third parties, such that Plaintiff and Class Members have no adequate remedy at law.

171.    Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

### FOURTH CAUSE OF ACTION
### Common Law Invasion of Privacy – Intrusion Upon Seclusion
### (On behalf of the Nationwide Class)

172.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth therein and brings this claim individually and on behalf of the proposed Class.

173.    Plaintiff and Class Members had a reasonable expectation of privacy in their

communications with SNHU via the SNHU Properties.

174.    Plaintiff and Class Members communicated sensitive and protected education information and individually identifiable information, including on password protected pages and student portals, that they intended for only SNHU to receive and which they understood SNHU would keep private.

175.    SNHU's disclosure of the substance and nature of Plaintiff and Class Members' communications to third parties without their knowledge and consent is an intentional intrusion on Plaintiff and Class Members' solitude or seclusion.

176.    Plaintiff and Class Members had a reasonable expectation that their communications, identity, education information and other data would remain confidential, and that SNHU would not install Tracking Technologies on the SNHU Websites to secretly transmit their communications to unauthorized third parties.

177.    SNHU was authorized to receive Plaintiff and Class Members' private and education information from their respective web browsers when they used the SNHU Websites, but it was not authorized to force Plaintiff and Class Members' web browsers to transmit information to Meta, Google, TikTok, Snap and other third parties without their consent or authorization. Indeed, SNHU promised it would *not* disclose this information without express consent as it was protected by FERPA.

178.    SNHU therefore obtained Plaintiff and Class Members' private and education information under false pretenses and/or exceeded its authority to obtain such information.

179.    As a result of SNHU's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

180.    Plaintiff and Class Members have been damaged as a direct and proximate result

of SNHU's invasion of their privacy and are entitled to just compensation, including monetary damages.

181.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests because of its intrusions upon Plaintiff and Class Members' privacy, as well as nominal damages.

182.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

183.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**
**Article I, Section 1 of the California Constitution (Invasion of Privacy)**
**(On behalf of the California Subclass)**

184.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth therein and brings this claim individually and on behalf of the proposed Class.

185.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

186.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

187.    The right to privacy in California's Constitution creates a right of action against private and government entities.

188.    Plaintiff and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution.

189.    The identifiable and private information SNHU disclosed to third parties without Plaintiff and Class Members' consent was used, among other things for targeted advertising purposes. The manner in which SNHU disclosed this information defeated established privacy-mechanisms, including FERPA, and social norms.

190.    This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there are third parties intercepting their private education information, let alone using it for profit.

191.    SNHU's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiff. SNHU did not have consent to disclose this information.

192.    Plaintiff and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by SNHU as a result of its intrusion upon seclusion.

193.    Defendant's conduct was willful, knowing, and carried out with conscious disregard for Plaintiff's and Class Members' rights. Plaintiff and Class Members are entitled to punitive and exemplary damages.

194.    Plaintiff and Class Members also seek any other relief the Court may deem just and proper.

**SIXTH CAUSE OF ACTION**
**Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On behalf of the California Subclass)**

195.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth therein and brings this claim individually and on behalf of the proposed Class.

196.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

197.    SNHU is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

198.    SNHU violated the UCL by engaging in unlawful and unfair business acts and practices.

199.    SNHU's "unlawful" acts and practices include its violation of FERPA, the ECPA, CIPA, Cal. Penal Code §§ 630, *et seq.*; the CDAFA, Cal. Penal Code § 502, and the common law right of privacy.

200.    SNHU's conduct violated the spirit and letter of these laws, which protect property and privacy interests and prohibit the unauthorized disclosure of private communications and personal information, including education information.

201.    SNHU's "unfair" acts and practices include its surreptitious disclosure of private communications and personal information, including Plaintiff and Class Members education information without consent.

202.    Plaintiff and Class Members were completely unaware of SNHU's conduct and could not have anticipated SNHU's intrusion into their privacy through its unlawful and unfair disclosure of their personal education information and private communications to third parties, including Meta, Snap, Google, and TikTok. Accordingly, Plaintiff and Class Members could not avoid the harm SNHU caused.

203.    SNHU's conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and Class Members. Further, the gravity of the harm of SNHU's secret disclosure of Plaintiff and Class Members' personal education information and private communications is significant, and there is no corresponding benefit resulting from such conduct.

204.    Plaintiff and Class Members have suffered injury, including the loss of money and/or property as a result of SNHU's unfair and unlawful practice of disclosing Plaintiff and Class Members' personal education information and private communications, which has economic value, to third parties, including Meta, Snap, Google, and TikTok.

205.    Plaintiff and Class Members have suffered harm in the form of diminution in the value of their personal information and private communications.

206.    SNHU caused damage to and loss of Plaintiff and Class Members' property right to control the dissemination and use of their personal information and private communications.

207.    SNHU has reaped unjust profits and revenues in violation of the UCL as a result of its unlawful and unfair conduct, including profits and revenues from its use of Plaintiff and Class Members' data for targeted advertising. Plaintiff and Class Members seek restitution and disgorgement of these unjust profits and revenues.

208.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

**SEVENTH CAUSE OF ACTION**
**Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502 ("CDAFA")**
**(On behalf of the California Subclass)**

209.    The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to ([including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

210.    Plaintiff and Class Members' devices on which SNHU installed the third party Tracking Technologies, including their computers, smart phones, and tablets, constitute "Computer system" within the meaning of the CDAFA. *Id*. § 502(b)(5).

211.    The data that SNHU accessed and disclosed from Plaintiff and Class Members' devices constitute "Data" within the meaning of the CDAFA. *Id*. § 502(b)(8).

212.    Defendant SNHU violated § 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiff and Class Members' devices and placing pixels, cookies, and other Tracking Technologies on their devices and local storage, in order to wrongfully obtain, disclose, and use their personal data in violation of users' reasonable expectations of privacy in their devices and data.

213.    Defendant SNHU violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiff and the Class Members' unique identifiers and other personal data from their devices.

214.    Plaintiff and the Class Members' device functionalities, device systems, device network, and browsers constitute "computer services" within the meaning of the CDAFA. Defendant SNHU violated § 502(c)(3) by knowingly and without permission causing them to be used and accessed by third parties through the third party Tracking Technology and identifying mechanisms incorporated on the SNHU Properties.

215.    Plaintiff and the Class Members' devices, device systems, device network, and browsers constitute "computer, computer system, or computer network" within the meaning of the CDAFA. Defendant SNHU violated § 502(c)(7) by knowingly and without permission causing those devices, device systems, device networks, and browsers to be accessed through third party tracking technology and identifying mechanisms incorporated on SNHU's Properties.

216.    Defendant SNHU violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiff and the Class Members, providing and/or assisting in providing advertisers, including Meta, Google, Snap, and TikTok the ability to access Plaintiff and the Class Members' devices, device systems, device networks, and browsers via the Tracking Technology and identifying mechanisms incorporated on SNHU's Properties.

217.    Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."  The Tracking Technology SNHU incorporated on its Properties constitutes computer contaminants as defined by § 502(b)(12) of the CDAFA. Defendants SNHU violated § 502(c)(8) by knowingly and without permission introducing computer contaminants, including Meta, Google, Snap, and TikTok's Tracking Technology on Plaintiff and the Class Members' devices, device systems, device networks, and browsers, which intercepted and disclosed their

personal education data to third parties. As described *supra*, the tracking technology is deeply hidden on SNHU's Properties; Plaintiff and Class Members had no way to remove it or opt out of its functionality.

218.    Plaintiff and Class Members suffered damage and loss as a result of SNHU's conduct. SNHU's practices have deprived Plaintiff and the Class Members of control over their valuable property (namely, their sensitive personal education data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Plaintiff and Class Members suffered harm because SNHU unjustly profited from the PII and private data SNHU disclosed by using it for its own business purposes, like targeted advertising. SNHU's use of Tracking Technology has caused harm to Plaintiff and Class Members by taking up additional bandwidth, CPU time, data usage, and power consumption in their devices. SNHU's practices have also violated Plaintiff and Class Members' private interests by collecting and disclosing their PII and other private information.

219.    Plaintiff and the Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

220.    Plaintiff and Class Members have also suffered irreparable and incalculable harm and injuries from SNHU's violations. The harm will continue unless SNHU is enjoined from further violations of this section. Plaintiff and Class Members have no adequate remedy at law.

221.    Plaintiff and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because SNHU's violations were willful and, upon information and belief, SNHU is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff and the Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

### EIGHTH CAUSE OF ACTION
**Negligence**
**(in the Alternative, on behalf of the Nationwide Class)**

222.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth therein and brings this claim individually and on behalf of the proposed Class.

223.    While SNHU's conduct was by all means intentional, it was at the very least (and in the alternative) negligent.

224.    SNHU is an educational institution whose students and prospective students, including Plaintiff and Class members, entrust with their sensitive personal and education information in connection with using SNHU's Properties.

225.    Given the highly sensitive nature of the personal and education information, and likelihood of harm resulting from its unauthorized disclosure, multiple statutes, regulations, and guidelines, including FERPA, in addition to the common law, impose a duty on SNHU to protect this information.

226.    SNHU owed a duty of care to Plaintiff and Class members to exercise reasonable care to protect their information consistent with the various statutory requirements, regulations, guidelines, and common law, including by not incorporating Tracking Technology on its Properties.

227.    SNHU's duty of care arose as a result of, among other things, the special relationship that existed between SNHU and its students and prospective students. SNHU was the only party in a position to ensure that it was sufficiently protecting Plaintiff and Class members' sensitive personal information, including education information, from unauthorized disclosure to third parties, including Meta, Google, Snap, and TikTok.

228.    SNHU breached its duty to exercise reasonable care in protecting Plaintiff and

Class member's sensitive personal information, including education information, when it disclosed this information without authorization to third parties, including Meta, Google, Snap, and TikTok.

229.    It was foreseeable to SNHU that the unauthorized disclosure of Plaintiff and Class members' sensitive personal information, including education information, could result in injury to its students and prospective students.

230.    As a direct and proximate result of SNHU's negligence, Plaintiff and Class members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### Unjust Enrichment

231.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth therein and brings this claim individually and on behalf of the proposed Class.

232.    Unjust enrichment is established where (1) the defendant benefitted; (2) at the plaintiff's expense; and (3) equity and good conscience require restitution.

233.    Plaintiff and Class members conferred a benefit on SNHU in the form of valuable private information, including education records, that SNHU collected from Plaintiff and Class Members.  SNHU collected, used, and disclosed this information to third parties, including at least Meta, Google, TikTok, and Snap, for its own gain, including for advertising, analytics, and marketing purposes.

234.    SNHU knew or appreciated the benefits of such information that it intentionally collected and disclosed to third parties, by virtue of its unauthorized disclosure and use of this data and the valuable analytics, insights, and advertisements generated from it, including using this unlawfully disclosed information to identify "lookalikes" that could be converted from potential to actual students through targeted advertising.

235.    Plaintiff and Class members also conferred a benefit on SNHU in the form of tuition and fees for its education services.

236.    Plaintiff and Class members would not have provided their valuable private and education information to SNHU or paid for SNHU's services if they had known SNHU was disclosing their private data to third parties and using it for its own gain.

237.    SNHU unjustly retained these benefits at the expense of Plaintiff and Class Members. SNHU did not provide any commensurate compensation to Plaintiff and Class members in exchange for its disclosure of their private information for its own gain.

238.    The benefits that SNHU derived from Plaintiff and Class Members' private and education information rightfully belong to Plaintiff and Class Members.  It would be inequitable under unjust enrichment principles for SNHU to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint. It would also be inequitable for SNHU to retain the subscription fees Plaintiff and Class Members paid to SNHU for its services as SNHU obtained them through its unfair and unconscionable trade practices.

239.    SNHU should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that SNHU received from them, and such other relief as the Court may deem just and proper. There is no remedy at law that will address this harm as monetary damages will not capture or account for the wrongful profit or benefit that SNHU received from exploiting Plaintiff and Class Members' data.

## **RELIEF REQUESTED**

Plaintiff, on behalf of themselves and the proposed Class, respectfully requests that the Court grant the following relief:

(a)    Certification of this action as a class action and appointment of Plaintiff and Plaintiff counsel to represent the Class;

(b)    Enter judgment in favor of the Plaintiff and Class Members on all counts, finding that SNHU violated the Electronic Communications Privacy Act, the California Invasion of Privacy Act, Plaintiff and Class Members' privacy rights as provided at common law, Plaintiff and Class Members' rights to restitution under common law, and all other laws described herein.

(c)    An order enjoining SNHU from engaging in the unlawful practices and illegal acts described therein; and

(d)    An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) nominal damages; (4) restitution; (5) reasonable attorneys' fees and expenses and costs of suit; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of themselves and the proposed Class, demand a trial by jury for all the claims asserted in this Complaint so triable.

Respectfully submitted,

Ashley Wright
By Her Attorneys,

Date: January 27, 2026

By */s/ Robert S. Carey*
Robert S. Carey, Esq. (NH Bar #11815)
Orr & Reno, PA
45 South Main Street
PO Box 3550
Concord, NH 03302
603-224-2381
rcarey@orr-reno.com

*Motions for Pro Hac Vice Admission to be Filed*

Christian Levis
Amanda Fiorilla
Rachel Kesten
Lowey Dannenberg, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL